IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

vs.

                                       Criminal No.   15-2843 MCA

STANLEY NATCHEZ, aka
STANLEY SALAZAR,

       Defendant.

## GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS THE INDICTMENT

The United States of America responds to Defendant Stanley Natchez' motion to dismiss

the Indictment.   The government respectfully requests that the Court deny the motion.

## I.      PROCEDURAL BACKGROUND

On October 07, 2015, a federal grand jury returned a superseding Indictment against

Defendant Natchez charging him with two counts of violating the Indian Arts and Crafts Act, 18

U.S.C. § 1159, by misrepresenting his art.   Doc. 16.   The Indictment also charged Mr. Natchez

with making material, false statements within the jurisdiction of the United States in violation of

18 U.S.C. § 1001.   Doc. 16.[1]   On January 26, 2016, Defendant Natchez, through counsel, filed a

motion to dismiss the Indictment, pursuant to Federal Rule of Criminal Procedure 12(b)(3).   Doc.

24.

## II  FACTUAL BACKGROUND

---

1 The Defendant states incorrectly that this conversation occurred during an undercover operation
when an agent was attempting to purchase paintings from him.   Defendant Natchez made the false
statements during a consensual encounter in which the United States Fish and Wildlife agent
identified himself as federal agent.  *See* Exhibit C, Transcript of August 12, 2015, Interview.

Mr. Natchez has been marketing his art, for some time, as produced by a Shoshone/Paiute Indian. He has attempted to gain access to museums and arts shows using this identity. When challenged on this self-definition, he changes his identity to Fernandeño-Tataviam, which is neither federally nor state recognized.

The United States Fish and Wildlife Service (USFWS), which has jurisdiction to enforce the Indian Arts and Crafts Act, 18 U.S.C. § 1159, initiated an investigation. Agents with USFWS conducted two undercover operations, one on December 11, 2014, and a second on March 6, 2015. Exhibits A and B, Transcripts of Undercover Transactions.

## III    ARGUMENT

The criminal provision of the Indian Arts and Crafts Act, states in pertinent part:

> It is unlawful to offer or display for sale or sell any good, with or without a Government trademark, in a manner that falsely suggests it is Indian produced, an Indian product, or the product of a particular Indian or Indian tribe or Indian arts and crafts organization, resident within the United States.

18 U.S.C. § 1159.

A. The Fernandeño-Tataviam Band of Mission Indians Is Not an Indian Tribe as Defined by the Indian Arts and Crafts Act Because It Is Neither Federally nor State Recognized for Purposes of the Act.

The Indian Arts and Crafts Act defines "Indian Tribe" for purposes of the Act as:

(A) has the meaning given the term in section 4 of the Indian Self-Determination and Education Assistance Act (25 U.S.C. 450b)[2]; and

(B) includes, for purposes of this section only, an Indian group that has been formally recognized as an Indian tribe by—

_____

2 These are the federally recognized tribes. "Indian tribe" means any Indian tribe, band, nation, or other organized group or community, including any Alaska Native village or regional or village corporation as defined in or established pursuant to the Alaska Native Claims Settlement Act (85 Stat. 688) [43 U.S.C.A. § 1601 et seq.], which is recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians. 25 U.S.C.A. § 450b.

        (i)       a State legislature;

        (ii)     a State commission; or

        (iii)    another similar organization vested with State legislative tribal
                 recognition authority . . . .

18 U.S.C.A. § 1159.

It is undisputed that the Fernandeño-Tataviam Band of Mission Indians is not federally recognized. The Defendant does not argue that it is.

Instead, the Defendant argues that Fernandeño-Tataviam Band of Mission Indians is recognized by the State of California and cites to a 2007 letter from the California Native American Heritage Commission (NAHC).

The letter reads:

This is regarding the recognition of the Fernandeño-Tataviam Band of Mission Indians as an organized California Native American government eligible inclusion [sic] in the Tribal Consultation requirements of local government lead agencies under California Government Code §65352.3 (SB 18) and for consultation as provided under the California Environmental Quality Act (CEQA). Also the tribe is eligible to participate in the provisions of California Public Resources Code § 5097.98, regarding the accidental discovery of Native American human remains. California cultural resources laws provide the for the full participation of both organized federally-recognized and non federally-recognized Native American tribes.

The Native American Heritage Commission is the state's Trustee Agency for Native American Cultural Resources and as such, manages the implementation of laws protecting the state's cultural resources in partnership with Native Americans. **The Native American Heritage Commission recognizes the Fernandeño-Tataviam Band of Mission Indians as an organized tribe to fully participate in the cultural resource management processes with local government and project developers as authorized under state statutes**.

Exhibit 8, attached to Defendant Natchez' motion [emphasis added by Defendant].

The Defendant has highlighted the salient portion of the letter. The group is recognized as an entity only to participate in cultural resource management processes.

Again, the statute recognizes a state commission or "**another similar organization vested with State legislative tribal recognition authority**" 18 U.S.C.A. § 1159 [emphasis added]. The only logical interpretation of the statute is that a commission, which has no legislative authority to recognize Indian tribes, is not a commission as defined by the statute.

In a footnote, the Defendant Natchez references the Oxford English Dictionary definition of a commission, as "[a] group of people entrusted by a government or other official body with authority to do something." Defense motion at pg. 13, fn. 6. The "something" that the NAHC is not vested or entrusted with authority to do is to recognize Indian tribes on behalf of the State of California. Several lines of evidence demonstrate the limited powers of the NAHC, including the following email from the NAHC General Counsel, on Feb. 5, 2016:

> We maintain a list of California Native American tribes for purposes of consultation with CEQA lead agencies to protect Native American sacred sites, burials and tribal cultural resources pursuant to CA Government Code section 65253.3 (SB 18). We do have standards for tribes to meet to qualify to be on the SB 18 list, but being on the list does not equate to "tribal recognition" in the traditional sense.

Exhibit N, Email from Terrie Robinson, General Counsel, Native American Heritage Commission.

According the founding documents of the NAHC, they do not have the power to recognize tribes as political entities under California law. The specific powers and duties of the Native American Heritage Commission include, in summary:

> (a) To identify and catalog (sic) places of special religious or social significance to Native Americans, and known graves and cemeteries of Native Americans on private lands . . . .

> (b) To make recommendations relative to Native American sacred places that are located on private lands . . . .

(c) To make recommendations to the Legislature . . . .

(d) To appoint necessary clerical staff.

(e) To accept grants or donations . . . .

(f) To make recommendations to the Director of Parks and Recreation and the California Arts Council . . . .

(g) To bring an action to prevent severe and irreparable damage to, or assure appropriate access for Native Americans to, a Native American sanctified cemetery, place of worship, religious or ceremonial site, or sacred shrine located on public property . . . .

(h) To request and utilize the advice and service of all federal, state, local, and regional agencies . . . .

(i) To assist state agencies . . . .

(k)(1) To mediate, upon application of either of the parties, disputes . . . .

Cal. Pub. Res. Code § 5097.94.

The NAHC website contains the following description:

The Native American Heritage Commission (NAHC), created in statute in 1976, is a nine-member body, appointed by the Governor, to identify and catalogue cultural resources (i.e., places of special religious or social significance to Native Americans, and known graves and cemeteries of Native Americans on private lands) in California. The Commission is charged with the duty of preserving and ensuring accessibility of sacred sites and burials, the disposition of Native American human remains and burial items, maintain an inventory of Native American sacred sites located on public lands, and review current administrative and statutory protections related to these sacred sites.

NAHC website (http://nahc.ca.gov/).

The commission is empowered to catalogue and preserve sacred, burial sites, not to

recognize political entities on behalf of the State.[3] A commission that has authority to

---

3 While the California NAHC authorities are confined to *consulting with environmental lead agencies* on sacred sites, burials, and cultural resource matters, the broad authorities of the North

recognize tribes must have the "force of law."  Exhibit EE, Letter from Hugo Tuefel III, Assistant Solicitor, DOI, to Senator John Corzine, dated May 14, 2003.

There are no state recognized tribes in California because "California does not have a process for officially recognizing non-federally recognized tribes"  Government Accountability Office2012 "INDIAN ISSUES: Federal Funding for Non-Federally Recognized Tribes." http://gao.gov/assets/600/590102.pdf.  GAO-12-348 2012:8.

As the GAO reports explicates:

[T]he California Native American Heritage Commission maintains a list of organized tribal governments in that state—including both federally recognized Indian tribes and non-federally recognized tribes.  Despite acknowledging these organized tribal governments and requiring cities and counties to consult with them under certain circumstances, California does not have a process for officially recognizing non-federally recognized tribes, according to a state official we spoke with.

Carolina State Commission of Indian Affairs, which follow, are a stark contrast to that of the California NAHC:

To establish appropriate procedures to provide for legal recognition by the State of presently unrecognized groups.  (10) To provide for official State recognition by the Commission of such groups. "§ 143B-406. North Carolina State Commission of Indian Affairs - duties; use of funds. . . .   To act as trustee for any interest in real property that may be transferred to the Commission for the benefit of State-recognized Indian tribes in accordance with a trust agreement approved by the Commission. . . .   (6) To review all proposed or pending State legislation and amendments to existing State legislation affecting Indians in North Carolina. NC General Statutes - Chapter 143B Article 9 15 (7) To conduct public hearings on matters relating to Indian affairs and to subpoena any information or documents deemed necessary by the Commission. (8) To study the existing status of recognition of all Indian groups, tribes and communities presently existing in the State of North Carolina. **(9) To establish appropriate procedures to provide for legal recognition by the State of presently unrecognized groups. (10) To provide for official State recognition by the Commission of such groups.** (11) To initiate procedures for their recognition by the federal government.  Exhibit DD at pgs 14-15.

*Id.* at pg. 8.

According to Wikipedia, California has no state recognized tribes.

https://en.wikipedia.org/wiki/State_recognized_tribes_in_the_United_States. *See also*,

Exhibits P, and FF, letters dated September 10, 2015 and May 16, 2011 from Olin Jones,

Director Office of Native American Affairs, State of California: "California does not have

any officially recognized tribes as defined by the Indian Arts and Crafts Act . . . .

California has no formal process for recognizing Indian tribes within the meaning of 25

C.F.R. parg 309.2( c)(2)."

The last word on this can be taken from Defendant Natchez:

Mr. Natchez:          San Fernando Fernandeno Mission Indians

`          Agent Wagner:          Okay – is that a recognized tribe?

Mr. Natchez:          No.

`          Agent Wagner:          Okay.   Is it state recognized?

Mr. Natchez:          No.[4]

Exhibit C, Transcript of August 12, 2015, Interview with Standley Natchez, at pg. 3.

The theory that because the Fernandeño-Tataviam Band of Mission Indians is allowed to

"…to fully participate in the cultural resource management processes with local government and

project developers . . . . ," Defendant Natchez can market his paintings as produced by a

Shoshone/Paiute Indian, when he is neither Shoshone nor Paiute, is something conceived by

defense counsel.   It is not a theory which even Mr. Natchez believes to be true.

C.  When Mr. Natchez Identifies Himself as a Shoshone Indian, He Is not Speaking the Truth and His Speech Is Not Protected Speech.

---

4   Mr. Natchez later tried to equivocate on this issue.   Exhibit C, at 30-31

As a preliminary matter, a clarification is needed as to how Mr. Natchez is marketing his products, what he said and the crime he is committing, in light of the mischaracterization of these facts and the government's arguments by the defense motion. For example, the defense counsel contends that the government considers "truth to be no defense." Defendant's Motion to Dismiss at pg. 1. The defense motion is replete with such Orwellian statements. Of course, truth is a defense to a charge of making false statements, but little of what Mr. Natchez says is true, and little of what is written in the defense motion is accurate. Throughout the Defendant's motion, he repeatedly states that Mr. Natchez' claim is to be "Indian" or "Native American." *Id*. at pgs. 7, 8, 9 footnote 5, 10 12.[5] The Defendant casts the prosecution as one seeking to punish Mr. Natchez for identifying who he is, that the government is prosecuting Mr. Natchez for not being "Indian enough." *Id*. at pg. 24. Were status as a Native American or Indian Mr. Natchez' only claim, this would be a different case, although a claim to be a recognized Indian of any kind would still be in violation of the Act.

The statute criminalizes the following misstatements:

> It is unlawful to offer or display for sale or sell any good, with or without a Government trademark, in a manner that falsely suggests it is Indian produced, an Indian product, **or the product of a particular Indian or Indian tribe** or Indian arts and crafts organization, resident within the United States.

18 U.S.C.A. § 1159 [emphasis added].

For many years, Mr. Natchez has claimed to be a Shoshone/Paiute Indian, with little, if any, reference to the Fernandeño-Tataviam Band of Mission Indians. Exhibits D-M and T-V.

During the first undercover operation, Mr. Natchez was not at the business. Exhibit A. His son, Viento Natchez, identified his father as a Shoshone-Tataviam and a Shoshone-Paiute Indian. Exhibit A at pg. 17-18, 20. Moreover, there were business cards in the shop identifying

---

5   It is unclear whom the defense counsel is quoting in the motion.

Mr. Natchez as Shoshone.

During the second undercover operation, Mr. Natchez was present.   Exhibit B.

Defendant Natchez engaged in the following conversation with the undercover agent:

SPECIAL AGENT VAZQUEZ:  So are you a Sioux?

MR. STANLEY NATCHEZ:     No, I'm a Shoshone.

SPECIAL AGENT VAZQUEZ:  Shoshone?

MR. STANLEY NATCHEZ:     Yeah, I'm Shoshone.

Exhibit B, transcript of March 6, 2015, undercover operation at pg. 7.

After buying a painting, Special Agent Vazquez asked Mr. Natchez to sign it.

MR STANLEY NATCHEZ:      What would you like me to – for me to write?

SPECIAL AGENT VAZQUEZ:   Well, it would be pretty simple.   It
                         would be for Noel, your name and – and your
                         -tribe and --

*Id*. at 12-13; see Exhibit W.   Mr. Natchez signed the painting as a Shoshone Indian.   Exhibit W.

Prior to Mr. Natchez's arraignment on the Indictment, and prior to his retaining counsel,

Special Agent Noel Wagner went to Mr. Natchez' shop and conducted a non-custodial and

consensual interview with Mr. Natchez:

SPECIAL AGENT WAGNER:    Okay? So it's coming up on Santa Fe Indian
                        Market week, so we're bringing up various
                        complaints.

MR. NATCHEZ:            Okay.

SPECIAL AGENT WAGNER:   One of them was you.

MR. NATCHEZ:            Okay.

SPECIAL AGENT WAGNER:   So maybe you can shed some light on that for
                       us.

MR. NATCHEZ:           All right.

| SPECIAL AGENT WAGNER: | Okay? I noticed from your business card and seen some of the other -- other items that you have out here. What's your tribal affiliation? |
| --- | --- |
| MR. NATCHEZ: | I'm Shoshone-Tataviam. |

Exhibit C, Transcript of August 12, 2015, interview, at pg. 2.

There is no such thing as a Shoshone-Tataviam Indian. Exhibit Z, Report of John E. McLaughlin, PhD, Associate Professor, Utah State University, answers to questions 1 and 3.

| SPECIAL AGENT WAGNER: | Okay. So you're a tribal member of a particular Shoshone band? |
| --- | --- |
| MR. NATCHEZ: | No. Tataviam is a Shoshone band. |

Exhibit C, Transcript of August 12, 2015, interview, at pg. 6.

The Fernandeno-Tataviam are not Shoshone. Historically, they were regarded as a band of Mission Indians. There is no ancestral, territorial or direct linguistic link between the Tataviam and the Shoshone peoples. Exhibit Z, Report of John E. McLaughlin, PhD, Associate Professor, Utah State University.

| SPECIAL AGENT WAGNER: | Okay. |
| --- | --- |
| MR. NATCHEZ: | "Tataviam" means – in Shoshone, it's the people who stand in the sun. |

*Id*. at pg. 6.

"Tataviam" is not a Shoshone word. In his affidavit, the, Rudy Ortega claims the word "Tataviam" is a Serrano word. Defendant Natchez, the Tataviam artist, and Mr. Ortega, the Tataviam president, cannot agree amongst themselves as to what kind of word it is, and neither is correct. Tataviam is neither a Shoshone nor a Serrano term. Tataviam is Kitanemuk word.[6]

---

6 *See* Hudson, Travis,1982 "The Alliklik-Tataviam Problem." Journal of California and Great Basin Anthropology 4(2):222-232; King, Chester and Thomas C. Blackburn, 1978 "Tataviam."

| SPECIAL AGENT WAGNER: | Okay.   But I've also seen your -- I've also seen your name in the promotion of your arts with the Shoshone-Paiute. |
|---|---|
| MR. NATCHEZ: | Right. That's what they called us for a long time, Paiutes. |
| SPECIAL AGENT WAGNER: | Okay. |
| MR. NATCHEZ: | And that happened with the Shoshone and the Paiutes and the Fort Tejons and theTataviams, they all were at the Fort Tejon Treaty. We all signed that Fort Tejon Treaty.   So for a long time, they just called us Paiutes. They just said, you're Shoshone Paiutes.   And then when you start look -- looking at our federal recognition, you know, the last ten years in -- in strength as far as genealogy, werealized that we were Tataviams and not Paiutes. |
| SPECIAL AGENT WAGNER: | Right. I understand. |

---

Pp. 535-537 in Handbook of North American Indians, vol. 8, California (R. Heizer, ed.). Washington, D.C.: Smithsonian Institution:   King and Blackburn (1978:537) wrote that

> While the term the Tataviam applied to themselves is unknown, their Kitanemuk neighbors called them táta·viam, related to their words ta·viyik 'sunny hillside' and ata·vihukwa? 'he is sunning himself.' …Thus, táta·viam might be roughly translated as 'people facing the sun' or 'people of the south-facing slope'. The Vanyume [Serrano] name for them may have been the same, for Kroeber (1907b:140) recorded the term Tatavi-yam from a Vanyume woman long resident with the Mohaves as the equivalent for the Mohave name Gwalinyuokosmachi 'tule sleepers' who lived in tule [reed] houses on a large lake.

King and Blackburn were only half right.   They misinterped Kroeber's research.   More specifically, Kroeber (1907:140) recorded the name "Tatavi-yam" in reference to the Yokuts people of California and the term translated to "tule sleepers."   Therefore, the word tataviam is a Kitanemuk word meaning "people who face the sun," and not Serrano.   In its Serrano form, it refers to an entirely different tribe – the Yokuts – and has nothing to do with facing the sun.   *See also,* Hudson (1982:228) reaffirms that the word Tataviam is a Kitanemuk word.   Moreover, Kroeber (1925: 556, 577, 613-614, 883) never used the word "Tataviam" or "Tatavitam" in his published works to refer to these people.   He called them "Alliklik."   Kroeber, Alfred K. 1925 Handbook of the Indians of California. Bureau of American Ethnology Bulletin 78. Washington.

MR. NATCHEZ:                    So I -- I've corrected that over the years of putting.
                                Shoshone-Tataviam.

*Id.* at 6.

Mr. Natchez has not corrected it over the years.   On the day of the second undercover

operation, he provided Agent Vazquez with documentation identifying himself as a Paiute.   Mr.

Natchez is neither a Shoshone nor a Paiute Indian.   There is no close link or relationship between

the Tataviam, a Takic-speaking people, and the Shoshone/Paiute, i.e., Numic-speaking peoples.

Exhibit Z, Report of John E. McLaughlin, PhD, Associate Professor, Utah State University.

Calling himself a Shoshone or a Paiute Indian is a branding, marketing, merchandising and

advertising technique.   The Shoshone and Paiute Tribes are well-known and easily-recognized

groups within the United States.   The Fernandeño-Tataviam Band of Mission Indians is not a

recognized tribe at all, and is virtually unknown to the general public.   Moreover, the affiliation

with the Fernandeño-Tataviam would not have allowed Mr. Natchez to market his products at

many shows.   This is not a victimless crime.   The victims are the Shoshone and Paiute Indians.

Assuming *arguendo* that the Fernandeño-Tataviam Band of Mission Indians were recognized by

the State of California, which it is not, Defendant Natchez is still guilty of the crime charged in the

Indictment because he is not a Shoshone or a Paiute Indian.

1.   The Fernandeño-Tataviam Mission Indians Have Never Identified Themselves
     as Shoshone or Paiutes.

According to the Affidavit of Rudy Ortega, the Tataviam Band called themselves the

Fernandeno "Shoshone" Band of Mission Indians from the mid-1980 to the early 1990s.   There is

no evidence, other than Mr. Otega's bald statement, that the word "Shoshone" was ever used in the

tribal name over the course of its history.   The Bureau of Indian Affairs Office of Federal

Recognition can find no paperwork that they ever used "Shoshone" in their official title.   The

Tataviam themselves have identified the various names they have used over the years in the

group's Federal Petition for Acknowledgement to the Bureau of Indian Affairs. Exhibits Q and

R; http://bia.gov/cs/groups/xofa/documents/text/idc1-032506.pdf.

In the 2015 Fernandeño-Tataviam Band of Mission Indians Federal Petition,

Supplementary and Updated Information to the Petition of 2009, Criteria 87.3(c) the following

Tribal history is noted on pages 21-22.

> From 1952 until 2008, Rudy Ortega, Sr. also served as elected leader of the Mission San Fernando Indians and its various successor organizations. The name of the Fernandeño government organization changed to San Fernando Band of Mission Indians during the early 1970s, and then changed in 1976 to the Fernandeño Band of Mission Indians. In the early 1990s, the community changed its name to the Femandeño Tataviam Band of Mission Indians. In 2002, the Femandeños adopted a constitutional government.

Exhibit R at 21-22.

The Tataviam's 2009 and 2015 Federal Petitions for Acknowledgment includes

dozens of anthropological and other historic sources concerning their cultural heritage,

social history, language, and community connections. Exhibits Q and R. The 2009

petition is 288 pages long; the 2015 Supplement is 28 pages long. *Id.* Based on their

own petitions for federal recognition, the Tataviam have never called themselves

Shoshone.[7]

A Google search for Fernandeño Shoshone Band of Mission Indians,

unsurprisingly, produced no results. Exhibit BB. Moreover, the webpage for the

Fernandeño/Tataviam Band of Mission Indians has a historical timeline, which includes

---

[7] The word Shoshone appears three times in the 256 pages that represent the petition and its supplement. One is a reference to academic study that has no relevance to what the Tataviams call themselves. The other two references are in a footnote which is repeated. This reference is to a statement made by a self-identified Tataviam, Charlie Cook (deceased), in a deposition. Mr. Cook appears to be referring to the Tataviam and Fernandenos as separate groups, and Mr. Cook's statement that the Fernandenos were "Shoshone" is incorrect. Moreover, Mr. Cook's statement it is not a statement as to what the Fernandeño-Tataviam Band has called itself over the years. Exhibits Q and R.

the name change in 1976, but no mention of the band ever calling itself Fernandeño

"Shoshone" Band of Mission Indians.   Exhibit AA.

There is a reason why the Tataviam do not call themselves" Shoshone" in their

federal petitions or on their website.   They are not Shoshone, and putting a false statement

like that in their federal petitions or on their website would decrease the likelihood of the

Band obtaining federal recognition.

    2.   The Fernandeño-Tataviam Band of Mission Indians Has No
         Ancestral, Direct Linguistical or Other Links to Shoshone/Paiute, i.e.,
         Numic-Speaking Peoples.

According to the Affidavit of Rudy Ortega, "Archaelogists, anthropologists, and linguists

have said that out people were ancestrally a Shoshone group."   Exhibit 3, attached to the

Defendant's motion to dismiss, paragraph 3.   Despite having the same lineage of Mr. Natchez,

Mr. Ortega has never identified himself as Shoshone Indian in publicly accessible documents and

does not do so in his affidavit.   Defendant's Exhibit 3:

The defense expert witness opines that there are links between the Shoshone and the

Tataviam.   Defendant's Exhibit 7.   He cites to an article that was published 109 years ago,

ignoring the century of research done since then.   *Id*.   He also cites to "popular scholarship"

which means non-scientific work, unvetted and unverified articles, produced by organizations

such as the Sylmar Chamber of Commerce, the scientific equivalent of People Magazine and the

National Enquirer.   *Id*. at pg. 8-9.

The Shoshone, Paiutes and Tatavian are only distant relatives within the Uto-Aztecan

family.   The Uto-Aztecan language family of North America is roughly equivalent to the

Indo-European language family of Europe and Asia both in age and diversity, so Tataviam and

Shoshone are no more closely related than English and Russian.   Exhibit Z, Report of John E.

McLaughlin, PhD, Associate Professor, Utah State University, answer to question 2.   The

Shoshone/Paiute peoples never occupied the same territory as the Tataviam. *Id.*, answer to question 5. While the Numic languages and Tataviam are related, they are only distantly related. The differences between them are great and they are not mutually intelligible to any degree. *Id*. They are as dissimilar as Russian and English. *Id*.

Moreover, as observed by Dr. McLaughlin, even though there was some an ancient link between the two groups, it dates back 4,000 to 6,000 years to the era of the Northern common Uto-Aztecan ancestral language. To put things in perspective, Christ lived a mere 2,000 years ago; 5,000 years ago, construction began on Stonehenge, and 6,000 years ago, civilizations were first developing in the Mesopotamia/Fertile Crescent. Moreover, As Dr. McLaughlin observed:

> Just because one's group has historical relations with other groups does not mean that one can appropriate that other group's identity as one's own. England has a cultural heritage in common with Norway and Denmark, but that doesn't mean that an English person can call himself or herself "Norwegian" or "Danish".

Exhibit Y, Comments of John E. McLaughlin, PhD, Associate Professor, Utah State University.

As Dr. McLaughlin observes, calling oneself a Shoshone-Tataviam is not the same as calling oneself a Filipino-American, which implies that someone with Filipino ancestry is living in the United States. *Id*. Neither Shoshone nor Tataviam are place names. *Id*. Both imply genetic ancestry, and Shoshone is not part of the genetic ancestry of the Tataviam. *Id*. Defendant Natchez can point to no ancestor of Shoshone origin. Indeed, no Tataviam can point to such an ancestor.

In the 2009 Tataviam Petition for Federal Recognition, there is no mention that the Tataviam (Takic speaking people) were a descendant group of the Shoshone (Numic speaking people). For example, at the beginning of the petition section entitled "2009: FEDERAL RECOGNITION NOW: A Social and Political History of the Fernandeño Tataviam Band of

Mission Indians: Exhibit R.   The Pre-Mission and Mission Periods" the following information is provided:

> In the pre-Mission period, before 1797, the Band's ancestors formed into villages comprised of a single patrilineal lineage for the Takic speaking Tongva and Tataviam ancestors, and a matrilineal lineage among the Chumash ancestors.

*Id*.

Thus, no mention is made here of a Numic (that is Shoshone and/or Paiute) ancestry.

Furthermore, in the Petition section "Criterion 83.7(a): External Identification of the Group as an American Indian Entity on a Substantially Continuous Basis Since 1900" it is clearly noted:

> Before, during, and after the period of missionization, the Fernandeño Tataviam Indians existed as a collection of villages/extended lineages, practicing intermarriage and mutual support.   Because of intermarriage across Tataviam, Tongva, Kitanemuk, and Chumash lines, there were often individuals from each of those linguistic groups inhabiting any given village, and several identities might be available to village occupants.

*Id*. at pg. 1.

Again, in this statement concerning the ancestral linkages of the Tataviam to other regional groups, there is there no mention of the Shoshone (a Numic speaking people).   If the Fernandeño-Tataviam Indians indeed were ancestrally a Shoshone group, as Rudy Ortega implies, there would be some mention of this ancestral link in the band's own petition for federal recognition.   There is no such link.

Moreover, the website for the Fernandeño Tataviam Indians under the heading "Ancestral Villages of Tataviam Citizens," the group lists Chumash, Serrano, Tataviam and Shivavitam. Exhibit CC.   There is no mention, anywhere, of a Numic-speaking people.

When Defendant Natchez says he is a Shoshone or a Paiute Indian he is not speaking the truth.

3. <u>The First Amendment Does not Protect Commercial Speech, Which Is False, Fraudulent and Uttered for Financial Gain.</u>

Contrary the arguments set forth in the Defendant' motion, the IACA does not prohibit Defendant Natchez from artistic expression.   He is free to paint as he chooses.   The IACA only punishes the way the art is marketed.

As a district court in Utah summarized:

Notwithstanding the aforesaid argument, the rights of manufacturers of publicly-perceived "Indian products" are not affected by the statute since the statute only concerns the sale, not the manufacture, of goods.   An artisan or other manufacturer may continue to express himself artistically through the creation of any products without fear of running afoul of the scope of the law. *Accord Native Am. Arts, Inc. v. Village Originals, Inc*., 25 F.Supp.2d 876, 881 (N.D.Ill.1998) ("[T]he [statute] does not interfere with the artistic content of [defendant's] merchandise...."). Hence, the statute does not "threaten[ ] to chill [the] constitutionally protected conduct," *Gaudreau*, 860 F.2d at 360, of any artisan or individual wishing to express himself through the creation of goods which may be publicly-perceived to be "Indian products."   [Defendant] Pourhassan's concern for individuals in the aforesaid category, therefore, cannot form the basis for pursuing a facial vagueness challenge to the statute

*United States v. Pourhassan*, 148 F. Supp. 2d 1185, 1189 (D. Utah 2001).

The speech in question is commercial speech:

Two district courts have considered the constitutionality of the 18 U.S.C. § 1159's civil counterpart, 25 U.S.C. § 305e, and concluded that the statute "does implicate First Amendment scrutiny since it involves the expressive aspects of commercial advertising."   *Village Originals*, 25 F.Supp.2d at 880; *see also Ho–Chunk Nation v. Nature's Gifts, Inc*., 1999 WL 169319, *3 (N.D.Ill. Mar.19, 1999) ("[Defendant] concedes that the Act restricts commercial speech. Commercial speech, which is speech related solely to the economic interests of the speaker, is protected by the First Amendment.").

*Id. at* 1189.

Commercial speech can be protected by the First Amendment but is afforded a lower level of scrutiny.

Although "speech" is at issue, the statute restricts (or forces) some form of commercial advertising, which is generally afforded a lower level of scrutiny than non-commercial speech. *See, e.g., Central Hudson Gas & Elec. Corp. v. Public*

*Serv. Comm'n*, 447 U.S. 557, 562–63, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980); *U.S. West, Inc. v. Federal Communications Comm'n*, 182 F.3d 1224, 1233 (10th Cir.1999).

*Id. at* 1190.

While commercial speech can be protected by the First Amendment, Defendant Natchez's speech in this case is not so protected because the speech is false.   Untruthful speech, commercial or otherwise, has never been protected for its own sake.   *Gertz v. Robert Welch, Inc*., 418 U.S. 323, 340 (1974); *Konigsberg v. State Bar*, 366 U.S. 36, 49, and n. 10 (1961).   Obviously, much commercial speech is not provably false, or even wholly false, but only deceptive or misleading. The First Amendment, does not prohibit the government from ensuring that the stream of commercial information flow cleanly as well as freely.   *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc*., 425 U.S. 748, 770-72 (1976).   There is no constitutional value in false statements of fact.   *Id*.   Neither the intentional lie nor the careless error materially advances society's interest in 'uninhibited, robust, and wide-open' debate on public issues.   *Id*.; *New York Times Co. v. Sullivan*, 376 U.S., at 270.   They belong to that category of utterances which "are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality."   *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942).

The Defendant advances an argument that his false statements about being a Shoshone/Paiute Indian are protected free speech also.   He cites to the Supreme Court decision in *United States v. Alvarez*, --- U.S. ----, 132 S.Ct. 2537 (2012).   The statute in question in that case was one that prohibited claiming falsely that one had been awarded military honors.   The Court held:

[F]alse statements "are not protected by the First Amendment in the same manner as

truthful statements," *Brown v. Hartlage*, 456 U.S. 45, 60–61, 102 S.Ct. 1523, 71 L.Ed.2d 732 (1982). *See also, e.g., Virginia Bd. of Pharmacy, supra*, at 771, 96 S.Ct. 1817 ("Untruthful speech, commercial or otherwise, has never been protected for its own sake"); *Herbert v. Lando*, 441 U.S. 153, 171, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979) ("Spreading false information in and of itself carries no First Amendment credentials"); *Gertz, supra*, at 340, 94 S.Ct. 2997 ("[T]here is no constitutional value in false statements of fact"); *Garrison v. Louisiana*, 379 U.S. 64, 75, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964) ("[T]he knowingly false statement and the false statement made with reckless disregard of the truth, do not enjoy constitutional protection").

*Id*. at 2545.

Although, the Court held the statute in question unconstitutional, the relevant portion of the

*Alvarez* opinion for purpose of this Court's analysis is how the Court distinguished the type of

speech prohibited by the Stolen Valor Act from the type of type of speech employed by Mr.

Natchez:

> **Where false claims are made to effect a fraud or secure moneys or other valuable considerations, say offers of employment, it is well established that the Government may restrict speech without affronting the First Amendment.** ***See, e.g., Virginia Bd. of Pharmacy***, **425 U.S., at 771, 96 S.Ct. 1817 (noting that fraudulent speech generally falls outside the protections of the First Amendment).** But the Stolen Valor Act is not so limited in its reach. Were the Court to hold that the interest in truthful discourse alone is sufficient to sustain a ban on speech, absent any evidence that the speech was used to gain a material advantage, it would give government a broad censorial power unprecedented in this Court's cases or in our constitutional tradition.

*Id*. at 2547-48 [emphasis added].

In this case, Defendant Natchez' false statements and advertisements that his art is

produced by a Shoshone/Paiute Indian are fraud perpetrated against the Shoshone and Paiute

Indians; the speech is uttered purely for the purposes of commercial gain and material advantage.

As such, it is not speech protected by the First Amendment.

> 4. <u>The Equal Protection Clause of the Fifth Amendment Does not Prohibit the Government from Prosecuting Mr. Natchez</u>.

Defendant Natchez claims he has a constitutional equal protection right to make the claims

that he makes, that is that the government is discriminating against him based on his race. He

cites to *Dawavendewa v. Salt River Project Agr. Imp. & Power Dist.*, 154 F.3d 1117 (9th Cir. 1998), for the proposition that the Equal Protection Clause of the Fifth Amendment precludes the government from discriminating against different Indian tribes. That case does not involve a government entity, but rather a private employer. *Id.* In essence, the circuit court concluded that the Indian preferences clause of Title VII allows **an employer** to discriminate between Indian and non-Indians, not between one tribal organization and another. *Id*.

This holding is in inapplicable to Defendant Natchez' case for a number of reasons: First, Defendant Natchez' crime is claiming to be a member of tribes to which he is not a member, the Shoshone and Paiutes. There is no case holding that the Equal Protection Clause protects false claims of tribal affiliation. Second, the Fernandeño-Tataviam Band of Mission Indian is not a tribe, at all, as defined by federal law.

The distinction between what a private employer or a local government may do and what the federal government may do is what separates Defendant Natchez from his cases. Congress has "plenary power" to legislate concerning the tribes, springing from both the Indian Commerce Clause of Article I of the Constitution, U.S. Const. art. I, § 8, cl. 3, and the treaty power of Article II, id. art. II, § 2, cl. 2; *see e.g., Tafoya v. City of Albuquerque*, 751 F. Supp. 1527, 1529-31 (D.N.M. 1990) (The Albuquerque City Council has considerably less power than the United States Congress to pass law discriminating in favor of members of federally recognized Indian tribes and pueblos).

In *Morton v. Mancari*, 417 U.S. 535, 537–39 (1974), non-Indian employees of the Bureau of Indian Affairs ("BIA") sued to enjoin the implementation of a provision of the Indian Reorganization Act (IRA) that granted appointment and promotion preferences to Indians seeking positions in the BIA. *Id.*;*see* 25 U.S.C. § 472. The plaintiffs argued that the preference was contrary to, and impliedly repealed by, the 1972 Equal Employment Opportunity Act's ("EEOA")

prohibition against race-based discrimination in federal employment, and that it constituted invidious racial discrimination in violation of the Due Process Clause of the Fifth Amendment. *Mancari*, 417 U.S. at 537, 547. The Court rejected both arguments. *Id*. at 551, 553–54. The Court held that the Indian employment preference did not constitute racial discrimination in violation of the Due Process Clause. *Id*. The Court concluded that the Indian employment preference was not based on a racial designation but on a political preference that triggered only rational-basis review. *Id*. "As long as the special treatment can be tied rationally to the fulfillment of Congress' unique obligation toward the Indians, such legislative judgments will not be disturbed." *Id*. at 555. The preference was "reasonable and rationally designed to further Indian self-government" and did not violate due process. *Id*.

In the wake of *Mancari*, the Court continued to distinguish between permissible differential treatment of Indian tribes based on political classifications, on the one hand, and impermissible differential treatment of groups based on racial or national origin classifications, on the other. In *Rice v. Cayetano*, 528 U.S. 495 (2000), the Court stated,

> Of course, as we have established in a series of cases, Congress may fulfill its treaty obligations and its responsibilities to the Indian tribes by enacting legislation dedicated to their circumstances and needs. As we have observed, "every piece of legislation dealing with Indian tribes and reservations ... single[s] out for special treatment a constituency of tribal Indians.

*Id*. at 519 (citations omitted) (alteration in original) (quoting *Mancari*, 417 U.S. at 552).

In *Delaware Tribal Business Committee v. Weeks*, 430 U.S. 73 (1977), the Court addressed Congress's distribution of an award by the Indian Claims Commission for claims arising out of an illegal sale of Delaware tribal lands in the nineteenth century. *Id*. Congress distributed funds to two federally recognized tribes, the Cherokee Delawares and the Absentee Delawares, and to members of those two tribes. *Id*. at 79-80. However, Congress did not distribute funds to the Kansas Delawares, an unrecognized tribe, or to its members, even though the Kansas Delawares,

like Cherokee Delawares and Absentee Delawares, were descendants of the Delawares whose lands had been illegally sold. *Id*. at 79-82. In upholding the differentiation between the two groups of Delawares, the Court wrote that "the legislative judgment should not be disturbed '[a]s long as the special treatment can be tied rationally to the fulfillment of Congress' unique obligation toward the Indians.' " *Id*. at 85 (alteration in original) (quoting *Mancari*, 417 U.S. at 555); *see also United States v. Wilgus*, 638 F.3d 1274, 1285-87 (10th Cir. 2011) (Indian tribes are political units not racial entities).

In *E.E.O.C. v. Peabody W. Coal Co*., 773 F.3d 977, 986-89 (9th Cir. 2014), the Ninth Circuit evaluated a claim that Hopi and Navajo leases requiring companies mining on the Navajo and Hopi reservations to give hiring preferences to Navajo Indians constituted national origin discrimination in violation of the Equal Protection clause. *Id*. Both leases had received approval from the Department of Interior pursuant to the Indian Mineral Leasing Act of 1938. *Id*. The company impleaded the Secretary of the Interior into the case and counterclaimed for declaratory relief. *Id*. The Court recognized that *Mancari* addressed a political classification providing a general Indian hiring preference rather than a tribe-specific preference. *Id.* at 986. The circuit court then held that *Mancari*'s logic applied with equal force where a classification addresses differential treatment between or among particular tribes or groups of Indians. *Id*. at 986-89.

As tribes are political entities, not racial entities, the Indian Arts and Crafts Act need be only tied rationally to the fulfillment of Congress' unique obligation toward the Indians. One can envision few things more sacred, valuable and personal to an Indian tribe than the tribe's art. The Indian Arts and Crafts Act was engineered to protect this priceless, cultural resource from artists who are charlatans and who are masquerading as something or someone they are not, ones such as Defendant Natchez.

**D.** Count III of the Indictment Represents a Separate and Distinct Crime Prosecutable Independent of the Other Counts.

Lastly, Defendant Natchez urges the Court to dismiss the false statements count of the Indictment, charged pursuant to 18 U.S.C. §§ 1101, if the Court or, for that matter, if the jury rules in the Defendant's favor on the other counts. Count III has its own elements, distinctly different from Counts I and II.

Special Agent Noel Wagner was conducting an investigation within the jurisdiction the United States. During the investigation, Defendant Natchez gave false statements to Special Agent Wagner. A criminal investigation, by its very nature, can result in two potential determinative outcomes, either a crime was committed or no crime was committed. The fact that the investigation decides between two potential outcomes does not mean that the occurrence of one of the potential outcomes determines whether or not there was an investigation.

The Defendant in *United States v. Radetsky*, 535 F.2d 556 ((10th Cir. 1976), the case cited by Defendant Natchez, was convicted of making false statement and the circuit court affirmed many of the convictions. *Id.* The false statements were claims regarding false Medicare reimbursements. *Id.* The circuit court concluded that some of the claims were not reimbursable by Medicare so the false claims about them were not material. *Id.* Defendant Natchez's false statements to Special Agent Wagner clearly had an impact on the integrity of the investigation and thus are material. *Brogan v. United States*, 522 U.S. 398 (1998).

## III.   CONCLUSION

From a pragmatic view and policy perspective, if Defendant Natchez is allowed to do what he has done for many years, anyone of any race, or any unrecognized tribal affiliation, can claim to be a member of any recognized Indian tribe and can market products as products of that tribe. A Scotsman could claim to be an Apache Indian and market his art as such. Perhaps, he could say

that his grandmother told him that he was an Apache; perhaps, going back to Mesopotamia he could claim that there is a linguistic and ancestral link between the Scots and the Apache. What he would be doing would not be any different really than what Mr. Natchez is doing. For the foregoing reasons, the United States respectfully requests that this Court issue an Order denying Defendant Natchez's motion to dismiss the Indictment.

Respectfully submitted,

DAMON P. MARTINEZ
United States Attorney

*filed electronically*
NORMAN CAIRNS
Assistant United States Attorney
201 3rd Street NW
Albuquerque, NM 87102
(505) 224-1521

I HEREBY CERTIFY that a copy of the foregoing was delivered to all counsel of record. on this 7th day of March 2016.

*File Electronically*
NORMAN CAIRNS
Assistant United States Attorney