**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

**UNITED STATES OF AMERICA,**

> **Plaintiff,**

**v.**                                        **No. CR 15-2843-MCA**

**STANLEY NATCHEZ,**

> **Defendant.**

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on Defendant Natchez' *Motion to Dismiss*. [Doc. 24]  The Court, having considered the submissions, the relevant law, and otherwise being fully advised in the premises, hereby **DENIES** the Motion.

## BACKGROUND

Both Defendant and the United States submit numerous documents for the Court to consider in reviewing this *Motion to Dismiss*.  As explained below, however, the Court is constrained to reviewing limited facts in considering a motion to dismiss.  Fed. R. Crim. P. 12(b)(1) ("A party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits.").  The starting place for the Court's review, therefore, is not the evidence produced by the parties but the language of the Superseding Indictment.  [Doc. 16]  *United States v. Hall*, 20 F.3d 1084, 1087 (10th Cir. 1994) ("Courts should refrain from considering evidence outside the indictment when testing its legal sufficiency.").

The Superseding Indictment charges Defendant with three Counts.  It states as follows:

Count 1

On or about December 11, 2014, in Santa Fe County, in the District of New Mexico, the defendant, **STANLEY NATCHEZ**, unlawfully, and knowingly offered to sell and displayed for sale goods that falsely suggested the goods were Indian produced, Indian products, the product of a particular Indian tribe and the product of an Indian arts and craft organization, resident within the United States, specifically several paintings were displayed and offered for sale by **STANLEY NATCHEZ**, at his art gallery, for a total price in excess of $1,000 and were falsely marketed as Indian produced, Indian products, the product of a particular Indian tribe and the product of an Indian arts and crafts organization, in that **STANLEY NATCHEZ**, the artist, is not an enrolled member of a recognized Indian tribe and is not a certified Indian artisan, nor a member of an Indian arts and crafts organization, as those terms are defined in Title 18, United States Code Section 1159(c)(1), (3) and (4).

In violation of 18 U.S.C. § 1159(a).

Count 2

On or about March 6, 2015, in Santa Fe County, in the District of New Mexico, the defendant, **STANLEY NATCHEZ**, unlawfully, and knowingly offered to sell and displayed for sale and sold goods that falsely suggested the goods were Indian produced, Indian products, the product of a particular Indian tribe and the product of an Indian arts and crafts organization, resident within the United States, specifically several paintings were displayed and offered for sale, and one painting was sold, by **STANLEY NATCHEZ**, at his art gallery, for a total price in excess of $1,000 and were falsely marketed as Indian produced, Indian products, the product of a particular Indian tribe and the product of an Indian arts and crafts organization, in that **STANLEY NATCHEZ**, the artist, is not an enrolled member of a recognized Indian tribe and is not a certified Indian artisan, nor a member of [an] Indian arts and crafts organization, as those terms are defined in Title 18, United States Code Section 1159(c)(1), (3) and (4).

In violation of 18 U.S.C. § 1159(a).

2

Count 3

On or about August 12, 2015, in Santa Fe County, in the District of New Mexico, the defendant, **STANLEY NATCHEZ**, did willfully and knowingly make materially false, fictitious, and fraudulent statements and representations in a matter within the jurisdiction of the executive branch of the Government of the United States, i.e., during an interview conducted by Special Agent Noel Wagner of the United States Fish and Wildlife Service who was conducting an official investigation, at **STANLEY NATCHEZ'S** art gallery in Santa Fe, in the District of New Mexico.   During the interview, **STANLEY NATCHEZ** stated that he was not marketing his art as that produced by a Shoshone/Paiute Indian, that he did not attempt to market his art at Indian art exhibits or Indian art shows, that he had never had any problems using his Tataviam group affiliation when seeking admission to art shows that require tribal affiliation, that he had not applied for admission to the Eiteljorg Indian Market and Festival, and that he had been invited to participate in the Heard Museum art show, without showing proof of recognized tribal affiliation.   The statements and representations were false because **STANLEY NATCHEZ** then and there knew that he had marketed his goods as produced by a Shoshone/Paiute Indian, that he had attempted to market his art at Indian art exhibits and at Indian art shows, that he had had problems with his Tataviam group affiliation when seeking admission to art shows that require tribal affiliation because the Tataviam group is not federally or state recognized, that he had applied for admission to the Eiteljorg Indian Market and Festival, which application was rejected because **STANLEY NATCHEZ** was not affiliated with a state or federally recognized Indian tribe, and that his application to participate in the Heard Museum art show was rejected because **STANLEY NATCHEZ** was not affiliated with a state or federally recognized Indian tribe.

In violation of 18 U.S.C. § 1001(a)(2).

[Doc. 16]

Defendant now moves to dismiss all three counts.   [Doc. 24]   With regard to Counts I and II, Defendant submits that, "as a matter of law, Mr. Natchez did nothing to violate the IACA; the prosecution violates Mr. Natchez's First Amendment rights under well-established precedent, and violates his right to the equal protection of laws."   [Doc.

24, p. 1]  Defendant primarily argues that he is an enrolled member of a tribe recognized by a California commission, and, therefore, he is an Indian within the meaning of the IACA, and thus he did not violate the statute.  [Doc. 24, pp. 3-13]  He further argues that "the Court, by addressing this motion, can dispose entirely of this matter because, even on the facts alleged by the government, coupled with facts that are not in dispute, the government cannot make a prima facie showing of criminality under the IACA and cannot overcome constitutional bars to this prosecution."  [Doc. 24, p. 8]  He also argues that even if the Court concludes that the tribal group with which he submits he is affiliated, the Fernandeño-Tataviam Band of Mission Indians, is not a recognized tribe within the meaning of the IACA, "prosecuting Mr. Natchez for describing his Native heritage when he sells his paintings violates the First Amendment."  [Doc. 24, p. 8] Finally, he argues that "singling out one Native American artist from other Native American artists for prosecution, based on the absence of amorphously defined 'recognition' status would violate principles of equal protection."  [Doc. 24, p. 8]

> With regard to Count III in the Superseding Indictment, Defendant argues:
>
> If Counts I and II are dismissed because of Mr. Natchez's status as, in fact, a Native American within the meaning of IACA or because the IACA is unconstitutional as applied to Mr. Natchez, his statements to the federal agent would not be "material" as a matter of law, because they do not relate to conduct that is criminal or otherwise subject to regulation.

[Doc. 24, p. 25]

## ANALYSIS

The Indian Arts and Crafts Act (IACA) creates both a civil action and a criminal action for selling an art or craft in a manner that falsely suggests that it is "Indian

4

produced."  25 U.S.C. § 305e(b) (allowing specific individuals to "bring an action against a person who, directly or indirectly, offers or displays for sale or sells a good . . . in a manner that falsely suggests it is Indian produced, an Indian product, or the product of a particular Indian or Indian tribe."); 18 U.S.C. § 1159(a) ("It is unlawful to offer or display for sale or sell any good . . . in a manner that falsely suggests it is Indian produced, an Indian product, or the product of a particular Indian or Indian tribe").[1]  In the criminal statute, an "Indian" is defined as "any individual who is a member of an Indian tribe[.]"  18 U.S.C. § 1159(c)(1).  The statute's definition of "Indian tribe" is the key provision in this case, and it reads:

> (3) the term "Indian tribe"--
>> (A) has the meaning given the term in section 4 of the Indian Self-Determination and Education Assistance Act (25 U.S.C. 450b); and
>> (B) includes, for purposes of this section only, an Indian group that has been formally recognized as an Indian tribe by--
>>> (i) a State legislature;
>>> (ii) a State commission; or
>>> (iii) another similar organization vested with State legislative tribal recognition authority[.]

18 U.S.C. § 1159(c).  Defendant, relying only on Section 1159(c)(3)(B)(ii), argues that he is a member of a tribe which has been recognized by "a State commission."  [Doc. 24, p. 9]

### Motion to Dismiss

Pursuant to Federal Rule of Criminal Procedure 12(b)(1), "A party may raise by pretrial motion any defense, objection, or request that the court can determine without a

---

[1] Also see generally William J. Hapiuk, Jr., *Of Kitsch and Kachinas: A Critical Analysis of the Indian Arts and Crafts Act of 1990*, 53 Stan. L. Rev. 1009 (2001).

trial on the merits."  Defendant relies on this portion of Rule 12 in making his *Motion to Dismiss*.  [Doc. 24, pp. 1, 8]  Until recently, the rule referred to "trial of the general issue" rather than "trial on the merits," but it was amended in 2014 to use "more modern" terminology, and "[n]o change in meaning is intended."   Fed. R. Crim. P. 12(b)(1) advisory committee's note to 2014 amendment.

> In a criminal case, the "general issue" is "defined as evidence relevant to the question of guilt or innocence." *United States v. Yakou*, 428 F.3d 241, 246 (D.C.Cir.2005) (quotation marks omitted). Thus, the Supreme Court has instructed, Rule 12 permits pretrial resolution of a motion to dismiss the indictment only when "trial of the facts surrounding the commission of the alleged offense would be of no assistance in determining the validity of the defense." *United States v. Covington*, 395 U.S. 57, 60, 89 S.Ct. 1559, 23 L.Ed.2d 94 (1969); *see also United States v. Knox*, 396 U.S. 77, 83, 83 n. 7, 90 S.Ct. 363, 24 L.Ed.2d 275 (1969); *United States v. Mandujano*, 425 U.S. 564, 585 n. 1, 96 S.Ct. 1768, 48 L.Ed.2d 212 (1976) (Brennan, J., concurring). If contested facts surrounding the commission of the offense would be of *any* assistance in determining the validity of the motion, Rule 12 doesn't authorize its disposition before trial.

*United States v. Pope*, 613 F.3d 1255, 1259 (10th Cir. 2010) (emphasis in original).  The central purpose of the jury is to determine "the general issue of a defendant's guilt or innocence," and to determine the facts of every case.  *Id.*  Thus,

> Even when the court is ultimately responsible for deciding the merits of a legal defense, it is sometimes said evidence adduced at trial can provide a "more certain framework" for its analysis—particularly when it isn't clear before trial precisely what evidence will and won't be admissible. *United States v. Reed*, 114 F.3d 1067, 1070 (10th Cir.1997) (holding that district court's void-for-vagueness determination "should be based only on the facts as they emerge at trial").

*Id.*  This is true even where the issue or defense raised is that a statute is unconstitutional as-applied, *id.* at 1261, as Defendant's challenge is, in part, in this case. [Doc. 24, pp. 14-25]

*Pope* recites additional reasons to avoid deciding fact-dependent issues raised in a motion to dismiss.

> [I]t also disserves judicial economy to hold a separate "mini-trial" on a defense only to repeat the exercise with largely the same evidence a short time later at the trial itself. A pretrial hearing in these circumstances may wind up being little more than a "dress rehearsal[ ]" that is not only needlessly repetitive but that might also facilitate an end-run around the limited discovery rules governing criminal prosecutions.

*Id.* at 1259 (citations omitted).  Finally, however, *Pope* recognized an exception for rare cases:

> [C]ourts may entertain . . . motions to dismiss that require resort to facts outside the indictment and bearing on the general issue in the "limited circumstances" where "[1] the operative facts are undisputed and [2] the government fails to object to the district court's consideration of those undisputed facts," and [3] the district court can determine from them that, "*as a matter of law*, the government is incapable of proving its case beyond a reasonable doubt." *United States v. Hall*, 20 F.3d 1084, 1088 (10th Cir.1994).

*Pope*, 613 F.3d at 1260 (emphasis in original).

Given the limited nature of allowable motions to dismiss, the Court cannot address most issues raised by Defendant.  For example, Defendant's argument that, as applied, the statute violates his First Amendment rights [Doc. 24, p. 14] depends in large part the evidence which will be developed at trial.  *See id*. at 1259.  This is because the precise statements Defendant made, as well as other facts constituting "the entire sales package," are relevant both to a conviction for falsely suggesting art is Indian produced and to his First Amendment arguments.  *See Navajo Nation v. Urban Outfitters, Inc.*, 935 F.Supp. 2d 1147, 1170 (D.N.M. 2013) (stating that the standard for violation of 25 U.S.C. § 305e(b)—Section 1159's civil analog—is "what the entire sales package, including

7

advertising, labeling, and place of sale, suggested to the average consumer"). Further, for the Court to consider most of the evidence submitted by the parties,[2] the Court would be required to hold a hearing and take substantially the same testimony and evidence that would be taken at trial, which, as stated in *Pope*, would be "not only needlessly repetitive but . . . might also facilitate an end-run around the limited discovery rules governing criminal prosecutions." *Pope*, 613 F.3d at 1259.

### One Issue Can Be Decided at This Juncture as a Matter of Law

The Court believes that one issue can be decided on this motion as a matter of law and without resort to facts which would be at issue in the trial on the merits. *See id.* at 1260 ("[C]ourts may entertain motions that require it to answer only pure questions of law."). Defendant argues that he is an Indian as defined by 18 U.S.C. § 1159(c)(3)(B)(ii), because he is a member of a tribe which is "an Indian group that has been formally recognized as an Indian tribe by . . . (b) a State commission." While only the jury as fact-finder can decide whether Defendant is a member of the Fernandeño Tataviam Band of Mission Indians (the Tataviam), or whether the Tataviam has been recognized as a

---

[2] This evidence includes: documentation of Defendant's tribal affiliation [Doc. 24-2 to 24-5]; documentation of the history of the Tataviam and whether it is a recognized tribe, including expert reports for both parties [Doc. 24-3; Doc. 24-6; to 24-8; Doc. 29-61 to 29-63] and the Tataviam's application for federal recognition as a tribe [Doc. 29-19 to 29-55]; transcripts of the encounters between Defendant and both an agent and an undercover agent [Doc. 24-10; Doc. 29-1; Doc. 29-2; Doc. 29-3; Doc. 29-4; Doc. 29-5]; evidence of how Defendant's art was marketed and how Defendant represented himself [Doc. 29-6 to 29-15; Doc. 29-56 to 29-59]; email correspondence between the Director of the Indian Arts and Crafts Board and the General Counsel for the California NAHC [Doc. 29-16]; and more.

tribe by the "Native American Heritage Commission" (NAHC) of California,[3] the Court can decide the legal question of whether California's NAHC is "State commission" as set forth in the IACA.

### *Is the Native American Heritage Commission a "State Commission" as Defined by the IACA?*

The United States argues that the NAHC is not the type of commission authorized to recognize tribes under the IACA.   [Doc 29, pp. 3-7]   The United States relies on "[s]everal lines of evidence" to support this argument, including: an email from the NAHC General Counsel; the NAHC website; a 2012 Government Accountability Office report (which states that "according to a state official we spoke with[,]" the State of California "does not have a process for officially recognizing non-federally recognized tribes"); Wikipedia; and Mr. Natchez himself.   [Doc. 29, pp. 4-7]   Defendant counters with an affidavit by the same general counsel for the NAHC.[4]   [Doc. 43]   The Court

---

[3] The parties have not explicitly stated that these facts are uncontroverted, therefore, they are determinations the jury must make.

[4] The email and affidavit both contain legal conclusions by the counsel for the NAHC. The Court will not consider these legal conclusions, as it is the duty of the Court to make the determinations of the law. *See Specht v. Jensen*, 853 F.2d 805, 807 (10th Cir. 1988) ("the judge is the sole arbiter of the law and its applicability").  However, the Court has considered the legal sources cited within the affidavit.  Further, the United States attached to its brief (without argument) letters to the Director of the Indian Arts and Crafts Board from the Office of the Attorney General of California, which opine that California does not have a "formal process for recognizing Indian tribes" and "does not have any officially recognized Indian tribes as defined by the Indian Arts and Crafts Act."  [Doc. 29-18; Doc. 29-70]   Again, the Court has considered the legal authority cited in these letters.  Nonetheless, these opinion letters are not entitled to deference.  *See Gonzales v. Oregon*, 546 U.S. 243, 255-56 (2006) ("Deference in accordance with *Chevron*, however, is warranted only when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation

concludes that these evidentiary proffers by the Government and Defendant are not necessary for a decision on the issue because the Court can determine whether, as a matter of law, Congress intended a "State commission" as set forth in 18 U.S.C. §1159(c)(3)(B)(ii), to include a commission given the power vested in the NAHC as set forth by the Legislature of the State of California.[5] *See Staples v. U.S.*, 511 U.S. 600, 604 (1994) ("[T]he definition of the elements of a criminal offense is entrusted to the legislature, particularly in the case of federal crimes, which are solely creatures of statute."); *United States v. Giles*, 213 F.3d 1247, 1248-49 (10th Cir. 2000) (stating that, in reviewing a motion to dismiss an indictment, "when the dismissal involves issues of statutory interpretation . . . we review the district court's decision de novo").

"State commission" is not defined in the IACA.  The parties submit no case law defining a "State commission" under the IACA, nor has the Court found any.  "[W]hen the wording of a statute is ambiguous and its legislative history fails to clarify which interpretation is correct, a court should apply a policy of lenity and construe the statute in favor of the criminal defendant."  *Giles*, 213 F.3d at 1249.  The legislative history offers no guidance on the meaning of a "State commission."  Nonetheless, the legislative history of the IACA reveals that the original version of the bill defined an "Indian tribe" only as currently expressed in Section 1159(c)(3)(A), specifically, those within the meaning of "section 4 of the Indian Self-Determination and Education Assistance Act (25

---

claiming deference was promulgated in the exercise of that authority." (internal quotation marks and citation omitted)).

[5] To the extent that the California Legislature vested authority in the Commission, clearly it would do so in the form of a law, making California statutes the first place to search for the answer to the question.

U.S.C. 450b)." Congress later added state recognized tribes, as defined in 18 U.S.C. § 1159(c)(3)(B), explaining the change as follows:

> Subsection (c) of Section 1159, as amended, defines the terms "Indian", "Indian product", "Indian tribe" and "tribal organization" for purposes of the section. Several members of Congress, who have state but not federally recognized Indian Tribes in their districts, objected to the definition of Indian Tribe, on the grounds that it did not include state recognized tribes. Because such tribes were not "Indian tribes" within the meaning of the bill, artisans in those tribes who represented their goods as Indian made would arguably be in violation of the Act. To avoid this problem, the definition of Indian tribe was revised to include state recognized tribes.

H.R. Rep. 101-400(II), *as reprinted in* 1990 U.S.C.C.A.N. 6391, 6394-95. This legislative history clearly demonstrates an intention to avoid criminalizing or stripping the ability to accurately market their art from indigenous people recognized by states as belonging to Indian tribes.

The Court will analyze the authority granted by the California Legislature to the NAHC,[6] to determine whether it is a commission which has the legislative authority to recognize Indian tribes. The NAHC was created by the California Legislature in 1976. Cal. Pub. Res. Code § 5097.91. By 1982, the Commission had the following "powers and duties:"

---

[6] The Court notes that it accepts, for the purposes of this case only, the United States' premise that the authority of the commission at issue must come from the state legislature. [Doc. 29, p. 4] An argument could be made that by not mentioning legislative authority in listing a "State commission," 18 U.S.C. § 1159(c)(3)(B)(ii), as it did in listing other "another similar organization," 18 U.S.C. § 1159(c)(3)(B)(iii), Congress did not intend to so narrowly define a State commission. However, regardless of whether Congress intended to focus only on a commission with "legislative authority to recognize Indian tribes," or to include other commissions, for example, those vested with authority to recognize tribes by their state's executive branch, here the answer is found in the authority vested in the NAHC by the California legislature.

(a) To identify and catalog places of special religious or social significance to Native Americans, and known graves and cemeteries of Native Americans on private lands. . . .

(b) To make recommendations relative to Native American sacred places that are located on private lands, are inaccessible to Native Americans, and have cultural significance to Native Americans for acquisition by the state or other public agencies for the purpose of facilitating or assuring access thereto by Native Americans.

(c) To make recommendations to the Legislature relative to procedures which will voluntarily encourage private property owners to preserve and protect sacred places in a natural state and to allow appropriate access to Native American religionists for ceremonial or spiritual activities.

. . .

(f) To make recommendations to the Director of Parks and Recreation and the California Arts Council relative to the California State Indian Museum and other Indian matters touched upon by department programs.

(g) To bring an action to prevent severe and irreparable damage to, or assure appropriate access for Native Americans to, a Native American sanctified cemetery, place of worship, religious or ceremonial site, or sacred shrine located on public property, pursuant to Section 5097.97. . . .

(h) To request and utilize the advice and service of all federal, state, local, and regional agencies.

(i) To assist Native Americans in obtaining appropriate access to sacred places that are located on public lands for ceremonial or spiritual activities.

(j) To assist state agencies in any negotiations with agencies of the federal government for the protection of Native American sacred places that are located on federal lands.

(k) To mediate, upon application of either of the parties, disputes arising between landowners and known descendants relating to the treatment and disposition of Native American human burials, skeletal remains, and items associated with Native American burials. . . .

(l) To assist interested landowners in developing agreements with appropriate Native American groups for treating or disposing, with appropriate dignity, of the human remains and any items associated with Native American burials.

1982 Cal. Stat. c. 1492, p. 5781, § 4.

Subsequently, in 2004, the State of California enacted Senate Bill 18.  2004 Cal. Stat. c. 905, § 8 (hereafter, S.B. 18). Senate Bill 18 revised multiple statutes, requiring, among other things, that "Prior to action by a legislative body to adopt or substantially

amend a general plan, the planning agency shall refer the proposed action to . . . a California Native American tribe, that is on the contact list maintained by the Native American Heritage Commission, with traditional lands located within the city or county's jurisdiction." S.B. 18, § 6.  Further, agencies preparing or amending a general plan must "provide opportunities for the involvement of . . . California Native American tribes" through consultation.  S.B. 18, §§ 5, 7.  Consultation is defined as:

> the meaningful and timely process of seeking, discussing, and considering carefully the views of others, in a manner that is cognizant of all parties' cultural values and, where feasible, seeking agreement.   Consultation between  government  agencies  and  Native  American  tribes  shall  be conducted in a way that is mutually respectful of each party's sovereignty. Consultation  shall  also  recognize  the  tribes'  potential  needs  for confidentiality with respect to places that have traditional tribal cultural significance.

 S.B. 18, § 8.  Senate Bill 18 also provided that California Native American tribes can hold conservation easements.  S.B. 18, § 2.  Senate Bill 18 further required the California Office of Planning and Research to create guidelines, in consultation with the NAHC, for consulting  with  California  Native  American  tribes  for:   the  preservation  of  Native American cemeteries, places of worship, religious or ceremonial sites or sacred shrines on public land; procedures for identifying the appropriate California Native American tribes for consultation; procedures for continuing to protect the confidentiality of the above  specified  sacred  sites;  and  procedures  to  facilitate  voluntary  landowner participation to protect such sites.  S.B. 18, § 3; Cal. Pub. Res. Code § 5097.9.

    And most importantly for purposes of this case, in addition to all of the powers described above, Senate Bill 18 identifies California Native American tribes as those that

are "on the contact list maintained by the Native American Heritage Commission."  S.B. 18, §§ 2, 4, 6, 7.

In 2014 (effective January 1, 2015 to June 23, 2015),[7] the California Legislature again defined a California Native American tribe as "a Native American tribe located in California that is on the contact list maintained by the Native American Heritage Commission" for purposes of tribal consultation under the California Environmental Quality Act.  Cal Stat. c. 532, § 3 (hereafter, A.B. 52), codified at Cal. Stat. Pub. Res. § 21073.  The Legislature required the NAHC to provide to California Native American tribes a list of "all public agencies that may be a lead agency . . . within the geographic area with which the tribe is traditionally and culturally affiliated," and how to request the agency to notify the tribe of projects within its cultural area for purposes of requesting consultation.  A.B. 52, § 2.  If the tribe requests notice of such projects, the lead agency must then "begin consultation with [the] California Native American tribe" prior to "the release of a negative declaration, mitigated negative declaration, or environmental impact report for a project."  A.B. 52, § 5.

In discussing the authority granted to the NAHC by the California Legislature, the United States myopically considered only one portion of the California Code [Doc. 29, pp. 4-5], and thus failed to acknowledge the power and authority of the NAHC discussed

---

[7] Effective as of June 24, 2015, the statutes creating the NAHC were revised again, this time to state that "'Tribe means a 'California Indian tribe' as that term is used in [the California Native American Graves Protection and Repatriation Act, Cal. Health & Safety Code, § 8012(j)]."  Cal Pub. Res. Code § 5097.94(I)(2)(B).  This amendment, however, does not change the Court's analysis because the conduct which forms the basis of Counts I and II preceded June 24, 2015, and thus this change is not material to the issue at hand.

in other pertinent provisions of the Code.  *See* Senate Bill 18.  As shown by the Court's review of pertinent legislative action regarding the NAHC, the NAHC had the implied legislative authority to recognize "California Native American tribes" as of 1976, and the express authority to do so as of 2004.[8]  S.B. 18, § 6; Cal. Civil Code § 815.3(c); Cal. Gov. Code § 65352(a)(11).  Given this authority, the Court concludes that the NAHC is the type of "State commission" Congress intended to allow to formally recognize an Indian group as an Indian tribe[9] under 18 U.S.C. § 1159(c)(3)(B)(ii).[10]

---

[8] Various regulations also rely on the list of California Native tribes maintained by the NAHC.  *See, e.g.*, Cal. Code Regs. tit. 14 § 895.1 and tit. 20 § 1714.

[9] The Court recognizes that it has used the terms "Native American" and "Indian" interchangeably in its analysis.  The Court does not intend to suggest any opinion on whether Congress in fact intended the terms to be interchangeable for purposes of the IACA, as this was not an issue raised by the parties.

[10] Alexa Koenig and Jonathan Stein reviewed the issue of state recognition of Native American tribes in 2008.  Alexa Koenig and Jonathan Stein, *Federalism and the State Recognition of Native American Tribes: A Survey of State-Recognized Tribes and State Recognition Processes across the United States*, 48 Santa Clara L. Rev. 79 (2008).  They state:

> [T]here is a pressing and significant need for additional information, including which tribes are state-recognized, and what rights come with state recognition. Internet sources that list state-recognized tribes vary dramatically in those they include, offer little explanation as to their inclusion standards, and do not detail widely disparate state recognition processes. The leading authority on Indian Law, Cohen's Handbook of Federal Indian Law, offers only a cursory overview of state recognition, and does not include a comprehensive list of tribes that fall into this subset. This Article fills that gap by clarifying which tribes have achieved state recognition, and providing Indian law practitioners, state governments and tribal governments with a broad overview of the various means states use to recognize tribes. This area of the law is changing rapidly. As a result, the information compiled below is meant as a starting place for further research, not as a static overview of recognition states and state tribes.

15

Further, referring to the "limited powers" of the NAHC, the United States disputes whether the power to list a California Native American tribe vested in the NAHC is the same power to "formally recognize" a tribe set forth in Section 1159(c)(3)(B).  [Doc. 29, pp. 4-5]  Congress did not speak to the purpose of "formal recogni[tion]" or the degree of formality of the process of recognition required in enacting Section 1159.[11]   The California Legislature indicates that the purpose of identification of tribes by the NAHC is to work with the tribes "in a way that is mutually respectful of each party's sovereignty" S.B. 18, Sec. 8, in order to preserve or mitigate impacts to "any Native American sanctified cemetery, place of worship, religious or ceremonial site, or sacred shrine located on public property."  S.B. 18, Sec. 3; Cal. Stat. Pub. Res. Code § 5097.9. The United States offers no litmus test for measuring which powers are sufficient in order to "formally recognize" a tribe within the meaning of Section 1159(c)(B).  The Court recognizes that there may be some other case which requires a court to more precisely articulate the boundary between "formal" and "informal" recognition, but, in the case at hand, formality is established by the fact that the NAHC is tasked with identifying California Native tribes for the purpose of government-to-government relations. The Court concludes that the Commission's power and duty to recognize tribes for the purpose of establishing government-to-government relations, and defining when the State

---

*Id.* at 83-84 (footnotes omitted).  Interestingly, in their article, the authors review a separate type of state recognition in California, through joint resolutions passed by the legislature, without discussing NAHC recognition.

[11] *See generally,* Alexa Koenig and Jonathan Stein, *Federalism and the State Recognition of Native American Tribes*, 48 Santa Clara L. Rev. at 102-09 (surveying the various types and degrees of formality of "state recognition").

of California has a duty to notify and consult with a tribe, establishes that the NAHC is a "State commission" with the power to "formally recognize" tribes.

The United States contrasts the NAHC with a "State commission" established in North Carolina, and asserts that the North Carolina Commission on Indian Affairs is an example of what Congress meant when it referred to a "State commission" with the power to formally recognize tribes.  [Doc. 29, pp. 5-6]  The United States emphasizes that the North Carolina Legislature listed the following duties of the North Carolina Commission on Indian Affairs:  "(9) To establish appropriate procedures to provide for legal recognition by the State of presently unrecognized groups.  (10) To provide for official State recognition by the Commission of such groups."  N.C. Gen Stat. § 143B-406.  [Doc. 29, p. 6 n.3]  The United States submitted no further argument or analysis on this point.  To the extent that the United States is pointing out the express language of the North Carolina Statute granting the North Carolina Commission the power to recognize groups, the Court has already discussed and concluded, above, that the California Legislature did the same, but it did so in statutes which the United States overlooked. While there are differences in word choice, the California Legislature granted the NAHC the authority to identify and maintain a list of California Native American tribes, which is sufficient under 18 U.S.C. § 1159(c)(3)(B).

By choosing not to place a limitation on the definition of "commission" in Section 1159(c)(3)(B)(ii), Congress deferred to the States' determinations of the criteria under which they would recognize an Indian group as an "Indian tribe."

17

> State recognition can take a variety of forms, and federal laws extending to state-recognized tribes defer to the states' characterizations. Some states administer lands set aside for tribal groups that are not recognized by the federal government. Other states provide political recognition through representation on state Indian commissions or councils, or administer benefit programs for non-federally recognized tribes located within their boundaries. At least one state has authorized a tribe to create a police force, vested with most of the same powers as state or municipal officers. Another form of state recognition may consist of merely acknowledging that a particular tribal group constitutes the indigenous people of a particular area in the state.

Cohen's Handbook of Federal Indian Law § 3.02[9] at 169-79 (Nell Jessup Newton ed., 2012) (internal footnotes omitted). Congress did not, and thus the Court will not, attempt to create a bright-line rule regarding the authority vested in a "State commission." Both the unrestricted definition of "State commission" and the legislative history here require a broader meaning of the term.[12] The IACA and its legislative history point to no intent to criminalize the unqualified representation by a person that his or her personally created art is Indian or Native American art when that person is a member of a group which has, in some form, been recognized by a state to be a member of an Indian or Native American tribe. Accordingly, and for purposes of the this statute only, the Court concludes that the legislative history behind the NAHC establish that it is a "State commission" with the authority to "formally recognize" a group as an "Indian tribe" for purposes of 18 U.S.C. § 1159(c)(3)(B)(ii).[13]

---

[12] Alternatively, the rule of lenity requires a broader interpretation of "State commission."

[13] The Court emphasizes that the particular language and legislative history unique to the IACA, and the fact that it creates not only a civil cause of action but also a crime, require an analysis unique to the IACA. The Court's analysis and conclusion are limited to the IACA, and not intended to be applied to statutes with different wording and different purposes, such as extending federal benefits. *Compare* 25 U.S.C. § 4103(13) (defining

*Counts I and II*

In pleading Counts I and II, the Superseding Indictment specifically relies on the theory that "Stanley Natchez, the artist, is not an enrolled member of a recognized Indian tribe . . . [as] defined in Title 18, United States Code Section 1159(c)(1)(3) and (4)." [Doc. 16]  Because this is the only theory of criminal conduct under Section 1159 alleged in the Superseding Indictment, at trial should the government fail to meet its burden in establishing that Defendant is not an enrolled member of the Fernandeño-Tataviam Band of Mission Indians or that this tribe is not on the NAHC's list of California Native tribes, then these Counts will be dismissed.  At this juncture the Court denies the Motion to Dismiss Counts I and II.  Defendant may renew his motion to dismiss prior to trial should the parties stipulate that Defendant is an enrolled member of the Fernandeño-Tataviam Band of Mission Indians and the Fernandeño-Tataviam Band of Mission Indians is a tribe recognized by the NAHC.  Further, as stated earlier (pages 7-8) Defendant's First Amendment and Equal Protection arguments must await development of the evidence at trial.

*Count III*

Finally, Defendant argues that, if his charges under the Indian Arts and Crafts Act are dismissed, then his charge under 18 U.S.C. § 1001(a)(2) for making a false statements must be dismissed because his statements were not "'material' as a matter of law, because they do not relate to conduct that is criminal or otherwise subject to

---

tribes recognized by states for purposes of the Native American Housing Assistance and Self-Determination Act); 25 U.S.C. § 1603(13)(A) (defining tribes recognized by States for purposes of receipt Indian Health Services).

regulation[,]" citing *United States v. Radestsky,* 535 F.2d 556 (10th Cir. 1990) (holding that doctor's submission of false reports to Medicare claiming he prescribed drugs he did not actually prescribe were immaterial because Medicare did not reimburse for those particular drugs).  [Doc. 24, p. 25]  The United States responds that ultimate guilt or innocence is not part of the materiality inquiry and thus Count III is not dependent on a conviction under Counts I and II.  [Doc. 29, p. 23]

As an initial matter, Counts I and II have not been dismissed, and thus, Defendant's argument cannot succeed at this juncture.   In either event, however, Defendant's argument would not be persuasive.

Section 1001(a) states:

whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully--
(1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact;
(2) makes any materially false, fictitious, or fraudulent statement or representation; or
(3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry;

Shall be fined under this title, imprisoned[,] . . . or both.

For a statement to be material, it "must have a natural tendency to influence, or be capable of influencing, the decision of the decisionmaking body to which it was addressed."  *United States v. Gaudin*, 515 U.S. 506, 509 (1995) (internal quotation marks, citation and brackets omitted).   In this investigation of potential criminal conduct, Defendant's statements could have influenced the decision of the United States, regardless of whether the United States was correct or incorrect in concluding that

Defendant is not an Indian as defined by 18 U.S.C. § 1159.  In this context, the pertinent decision was whether to move forward with seeking a criminal conviction or pursuing civil remedies, and a jury could determine that Defendant's statements could have influenced the United States' decision to move forward with charges.  *See U.S. v. Brittain*, 931 F.2d 1413, 1416 (10th Cir. 1991) (distinguishing *Radetsky* from situation in which false statements could have influenced the decision to seek EPA enforcement), *abrogated on other grounds by Gaudin*, 515 U.S. at 518-19.  Thus, the Court must allow the jury to determine the materiality of Defendant's statements.  *Gaudin*, 515 U.S. at 512, 522-23 (holding that "materiality" under 18 U.S.C. § 1001 is a mixed question of law and fact and thus within the province of the jury).

**CONCLUSION**

For the foregoing reasons, the Defendant's *Motion to Dismiss* [Doc. 24] is **DENIED**.

**SO ORDERED** this 21st day of June, 2016 in Albuquerque, New Mexico.

_____
M. CHRISTINA ARMIJO
Chief United States District Judge